BRAMSON, PLUTZIK, MAHLER & BIRKHAEUSER, LLP
Alan R. Plutzik (Bar No. 077785)
L. Timothy Fisher (Bar No. 191626)
Kathryn A. Schofield (Bar No. 202939)
2125 Oak Grove Road, Suite 120
Walnut Creek, California 94598
Telephone: (925) 945-0200
Facsimile: (925) 945-8792

SCHIFFRIN & BARROWAY LLP
Eric L. Zagar
Trevan Borum
Tara P. Kao
280 King of Prussia Road
Radnor, PA 19087
Telephone: (610) 667-7706
Facsimile: (610) 667-7056

Attorneys for Plaintiff

E-filing

ORIGINAL FILED OCT 17 2006 RICHARD W. WIEKING CLERK, U.S. DISTRICT COURT NORTHERN DISTRICT OF CALIFORNIA OAKLAND

ADR

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

C06-06486 JW PVT

SOUTHEASTERN PENNSYLVANIA TRANSPORTATION AUTHORITY, Derivatively on Behalf of Nominal Defendant NETWORK APPLIANCE, INC.,

Plaintiff,

v.

DANIEL J. WARMENHOVEN, JEFFRY R. ALLEN, CAROL A. BARTZ, M. HELEN BRADLEY, ALAN L. EARHART, STEVEN GOMO, DAVID HITZ, JAMES K. LAU, MARK LESLIE, THOMAS F. MENDOZA, NICHOLAS G. MOORE, SACHIO SEMMOTO, GEORGE T. SHAHEEN, CHARLES E. SIMMONS, DONALD T. VALENTINE and ROBERT T. WALL,

Defendants,

and,

NETWORK APPLIANCE, INC.

Nominal Defendant.

Case No.

**SHAREHOLDER DERIVATIVE COMPLAINT**

**JURY TRIAL DEMANDED**

Plaintiff Southeastern Pennsylvania Transportation Authority ("SEPTA"), by the undersigned attorneys, submits this Derivative Complaint (the "Complaint") against the defendants named herein.

## NATURE AND SUMMARY OF THE ACTION

1. This is a shareholder's derivative action brought for the benefit of nominal defendant Network Appliance, Inc. ("Network Appliance" or the "Company") against certain members of its Board of Directors (the "Board") and certain of its executive officers seeking to remedy defendants' breaches of fiduciary duties, unjust enrichment, statutory violations, and other violations of law.

2. On September 6, 2006, the United States Senate Committee on Finance held a hearing, "Executive Compensation: Backdating to the Future/Oversight of current issues regarding executive compensation including backdating of stock options; and tax treatment of executive compensation, retirement and benefits."

3. At the Senate Finance Committee Hearing, the Senate Finance Committee Chairman, Senator Chuck Grassley, in his opening statement, stated: "[Options backdating] is behavior that, to put it bluntly, is disgusting and repulsive. It is behavior that ignores the concept of an 'honest day's work for an honest day's pay' and replaces it with a phrase that we hear all too often today, 'I'm going to get mine.' . . . [S]hareholders and rank-and-file employees were ripped off by senior executives who rigged stock option programs – through a process called 'back-dating' – to further enrich themselves. And as we have found far too often in corporate scandals of recent years, boards of directors were either asleep at the switch, or in some cases, willing accomplices themselves. . . ."

4. At the Senate Finance Committee Hearing, the Chairman of the Securities Exchange Commission, Christopher Cox, stated, "Rather obviously, this fact pattern [of backdating options] results in a violation of the SEC's disclosure rules, a violation of accounting rules, and also a violation of the tax laws." The Commissioner of the IRS Mark Everson agreed and further stated, "Picking a date on which the stock price was low in comparison with the current price gives the

employee the largest potential for gain on the option and makes it possible for the employee to benefit from corporate performance that occurred before the option was granted."

5. In his statement before the Senate Finance Committee, Deputy Attorney General Paul J. McNulty described the practice of stock option backdating "as a brazen abuse of corporate power to artificially inflate the salaries of corporate wrongdoers at the expense of shareholders," and said "For some of those companies that have now disclosed backdated grants, corporate reputations have been tarnished and shareholder value has diminished substantially. . . ."

6. On September 6, 2006, MarketWatch, in an article titled "SEC Probing more than 100 firms on options: Cox," quoted the Senate Banking Committee Chairman, Senator Richard Shelby, saying that manipulation of options grant dates "appears to be a black-and-white example of securities fraud," and "Corporate officers and directors engaging in this practice are cheating the owners of the company and should be held accountable to the fullest extent possible."

7. On July 22, 2006, *The San Francisco Chronicle* recounted SEC Chairman Christopher Cox's announcement in San Francisco on July 20, 2006 where he said, "[backdating in many cases] makes a hash of (companies') financial statements . . . [and is] poisonous [to efficient markets]. . . . It is securities fraud if you falsify books and records. It is securities fraud if you present financial statements to the SEC that do not comply with generally accepted accounting principles. There is no requirement that (the defendant) personally profit [to prove that a crime occurred.]"

8. On June 18, 2006, in an article titled, "Options Scandal Brewing in Corporate World," SEC Chairman Christopher Cox was quoted, saying "[Backdating options] isn't a question about 'Whoops, I may have (accidentally) crossed a line here' . . . It's a question of knowingly betting on a race that's already been run."

9. On May 26, 2006, *Forbes*, in an article titled, "The Next Big Scandal," quoted Former Securities and Exchange Commission ("SEC") Chairman Harvey L. Pitt, saying "What's so terrible about backdating options grants? For one thing, it likely renders a company's proxy materials false and misleading. Proxies typically indicate that options are granted at fair market

value. But if the grant is backdated, the options value isn't fair – at least not from the vantage point of the company and its shareholders."

10. As alleged herein, in gross breach of their fiduciary duties as officers and/or directors of Network Appliance, the Individual Defendants (as defined herein) colluded with one another to:

(a) improperly backdate dozens of grants of Network Appliance stock options to Network Appliance Chief Executive Officer Daniel J. Warmenhoven ("Warmenhoven") and several other Network Appliance executives, in violation of the Company's shareholder-approved stock option plans;

(b) improperly record and account for the backdated stock options, in violation of Generally Accepted Accounting Principles ("GAAP");

(c) improperly take tax deductions based on the backdated stock options, in violation of Section 162(m) of the Internal Revenue Code;

(d) produce and disseminate to Network Appliance shareholders and the market false financial statements and other false SEC filings that improperly recorded and accounted for the backdated option grants and concealed the improper backdating of stock options.

11. As a result of the Individual Defendants' egregious misconduct, Network Appliance has sustained millions of dollars in damages, and Warmenhoven and the other recipients of the backdated stock options have garnered millions of dollars in unlawful profits.

## JURISDICTION AND VENUE

12. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 in that this Complaint states a federal question. This Court has supplemental jurisdiction over the state law claims asserted herein pursuant to 28 U.S.C. § 1367(a). This action is not a collusive one to confer jurisdiction on a court of the United States which it would not otherwise have.

13. Venue is proper in this district because a substantial portion of the transactions and wrongs complained of herein, including the defendants' primary participation in the wrongful acts detailed herein, occurred in this district. One or more of the defendants either resides in or

maintains executive offices in this district, and defendants have received substantial compensation in this district by engaging in numerous activities and conducting business here, which had an effect in this district.

## PARTIES

14. Plaintiff SEPTA is, and was at all relevant times, a shareholder of nominal defendant Network Appliance.

15. Nominal defendant Network Appliance is a Delaware corporation with its principal executive offices located at 495 East Java Drive, Sunnyvale, California 94089. According to its public filings, Network Appliance is a supplier of storage and data management solutions for enterprise customers worldwide. The Company's hardware and software products, partnerships, and services help customers dramatically simplify the complexity of storing and managing corporate data. Network Appliance has had more than 500 shareholders of record at all times relevant hereto.

### Option Recipient Defendants

16. Defendant Jeffry R. Allen ("Allen") has served as a director of the Company since May 2005. He also served as the Company's Executive Vice President of Business Operations from 2003 to 2005 and as Chief Financial Officer, Senior Vice President, Finance and Operations, and Secretary from 1996 to 2003.

17. Defendant Carol A. Bartz ("Bartz") has served as a director of Network Appliance and as a member of the Compensation Committee of the Board (the "Compensation Committee") since 1995.

18. Defendant M. Helen Bradley ("Bradley") served as the Company's Vice President, Engineering from September 1995 to 1999.

19. Defendants Steven J. Gomo ("Gomo") has served as the Company's Executive Vice President, Finance, and Chief Financial Officer since August 2002.

20. Defendant David Hitz ("Hitz") co-founded Network Appliance in 1992 and has served as an Executive Vice President of the Company since 2004. Hitz also served as Executive

Vice President, Engineering from 2000 to 2004 and served in various capacities from 1992 to 2000.

21. Defendant James K. Lau ("Lau") co-founded Network Appliance in 1992 and has served as the Company's Executive Vice President and Chief Strategy Officer since May 2000. He served in various positions with Network Appliance since 1992, including Vice President, Chief Technical Officer, and Vice President of Engineering.

22. Defendant Thomas F. Mendoza ("Mendoza") has served as the Company's President since 2000. He also served as Senior Vice President, Worldwide Sales and Marketing from 1999 to 2000, as Senior Vice President, Worldwide Sales from 1998 to 1999, and as Senior Vice President, North American Sales from 1994 to 1998.

23. Defendant Sachio Semmoto ("Semmoto") served as a director of the Company from 1999 to 2006.

24. Defendant Charles E. Simmons ("Simmons") served as the Company's Vice President, Corporate Development from February 1999 to 2000 and as Vice President, Marketing from May 1996 to February 1999.

25. Defendant Donald T. Valentine ("Valentine") has served as Chairman of the Board since September 1994.

26. Defendant Daniel J. Warmenhoven ("Warmenhoven") has served as Network Appliance's Chief Executive Officer and as a director since October 1994. He also served as the Company's President from October 1994 to May 2000.

27. Collectively, defendants Allen, Bartz, Bradley, Gomo, Hitz, Lau, Mendoza, Semmoto, Simmons, Valentine, and Warmenhoven are referred to herein as the "Option Recipient Defendants."

**Director Defendants**

28. Defendant Alan L. Earhart ("Earhart") has served as a director of Network Appliance and as a member of the Audit Committee of the Board (the "Audit Committee") since December 2004.

29. Defendant Mark Leslie ("Leslie") has served as a director of Network Appliance since July 2004 and as a member of the Compensation Committee since 2005.

30. Defendant Nicholas G. Moore ("Moore") has served as a director of Network Appliance and as Chair of the Audit Committee since April 2002.

31. Defendant George T. Shaheen ("Shaheen") has served as a director of the Company and as a member of the Audit Committee since June 2004.

32. Defendant Robert T. Wall ("Wall") has served as a director of Network Appliance since January 1993 and as a member of the Compensation Committee since at least 1996. Wall also served as a member of the Audit Committee from 2001 to 2002.

33. Collectively, Allen, Bartz, Earhart, Leslie, Moore, Shaheen, Valentine, Wall, and Warmenhoven are referred to herein as the "Director Defendants."

**Individual Defendants**

34. Collectively, the Option Recipient Defendants and Director Defendants are referred to herein as the "Individual Defendants."

**DUTIES OF THE INDIVIDUAL DEFENDANTS**

35. By reason of their positions as officers and/or directors of the Company and because of their ability to control the business and corporate affairs of the Company, the Individual Defendants owed the Company and its shareholders the fiduciary obligations of good faith, trust, loyalty, and due care, and were and are required to use their utmost ability to control and manage the Company in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of the Company and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit. Each director and officer of the Company owes to the Company and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing.

36. The Individual Defendants, because of their positions of control and authority as directors and/or officers of the Company, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

37. To discharge their duties, the Individual Defendants, as the officers and/or directors of the Company, were required to exercise reasonable and prudent supervision over the management, policies, practices and controls of the Company. By virtue of such duties, the Individual Defendants were required to, among other things:

(a) exercise good faith in ensuring that the affairs of the Company were conducted in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business;

(b) exercise good faith in ensuring that the Company was operated in a diligent, honest and prudent manner and complied with all applicable federal and state laws, rules, regulations and requirements, including acting only within the scope of its legal authority;

(c) exercise good faith in supervising the preparation, filing and/or dissemination of financial statements, press releases, audits, reports or other information required by law, and in examining and evaluating any reports or examinations, audits, or other financial information concerning the financial condition of the Company; and

(d) exercise good faith in ensuring that the Company's financial statements were prepared in accordance with GAAP; and

(e) refrain from unduly benefiting themselves and other Company insiders at the expense of the Company.

38. The Individual Defendants, particularly the executive officers and the members of the Audit Committee, were responsible for maintaining and establishing adequate internal accounting controls for the Company and to ensure that the Company's financial statements were based on accurate financial information. According to GAAP, to accomplish the objectives of accurately recording, processing, summarizing, and reporting financial data, a corporation must establish an internal accounting control structure. Among other things, the Individual Defendants were required to:

(1) make and keep books, records, and accounts, which, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the issuer; and

(2) devise and maintain a system of internal accounting controls sufficient to provide reasonable assurances that –

(a) transactions are executed in accordance with management's general or specific authorization, and

(b) transactions are recorded as necessary to permit preparation of financial statements in conformity with [GAAP].

39. Network Appliance's proxy statements provide that the Audit Committee "reviews, acts on and reports to the Board of Directors with respect to various auditing and accounting matters, including the selection of the Company's auditors, the scope of the annual audits, fees to be paid to the auditors, the performance of the Company's auditors, the accounting practices of the Company and other such functions."

## FACTUAL ALLEGATIONS

### Stock Option Grants to the Option Recipient Defendants

40. At all times relevant hereto the Compensation Committee determined the salaries, incentive compensation, and stock option awards for executive officers of Network Appliance and administered the Company's stock option plans.

41. From 1996 to 2002, the Compensation Committee granted certain Network Appliance stock options to the Option Recipient Defendants, as follows:

| Purported Date of Grant | Name of Officer | Exercise Price | Number of Options[1] |
|---|---|---|---|
| 08/01/96 | Simmons | $21.750 | 90,000 |
| 10/23/96 | Valentine | $31.500 | at least 6,000 |
| 04/01/97 | Mendoza | $31.120 | 22,500 |
| | Bradley | $31.120 | 20,000 |
| | Simmons | $31.120 | 10,000 |

[1] Where the total number of options is unknown, *i.e.* where the phrase "at least" is utilized, the stock option grant did not appear in any proxy statements filed by the Company but were first disclosed in Form 4 filings, which only included the number of options pursuant to the grant that were exercised and left unexercised on the transaction date. Furthermore, the exercise prices and number of options have not been adjusted for the Company's 2-for-1 stock splits effective December 19, 1997, December 22, 1998, December 21, 1999, and March 23, 2000 unless noted otherwise.

| | | | |
|---|---|---|---|
| 04/30/97[2] | Warmenhoven | $14.560 | 160,000 |
| 07/17/97[3] | Bradley | $18.940 | 70,000 |
| | Mendoza | $18.940 | 70,000 |
| 11/02/98[4] | Simmons | $28.440 | 10,000 |
| 05/24/99[5] | Warmenhoven | $11.250 | 1,100,000 |
| | Allen | $11.250 | 600,000 |
| | Hitz | $11.250 | 400,000 |
| | Mendoza | $11.250 | 800,000 |
| 10/26/99 | Bartz | $66.620 | at least 10,000 |
| 02/01/00[6] | Warmenhoven | $53.910 | 500,000 |
| | Allen | $53.910 | 300,000 |
| | Hitz | $53.910 | 300,000 |
| | Mendoza | $53.910 | 300,000 |
| | Simmons | $53.910 | 100,000 |
| 05/10/00 | Mendoza | $58.000 | 75,000 |
| 04/26/01 | Warmenhoven | $20.160 | 800,000 |
| | Allen | $20.160 | 500,000 |
| | Hitz | $20.160 | 400,000 |
| | Lau | $20.160 | 400,000 |
| | Mendoza | $20.160 | 600,000 |
| 02/07/02 | Warmenhoven | $15.320 | 360,000 |
| | Allen | $15.320 | 260,000 |
| | Hitz | $15.320 | 190,000 |
| | Lau | $15.320 | 190,000 |
| | Mendoza | $15.320 | 260,000 |
| | Semmoto | $15.320 | at least 100,000 |
| 08/12/02 | Gomo | $7.450 | at least 200,000 |
| 11/01/02 | Warmenhoven | $9.990 | 400,000 |
| | Allen | $9.990 | 200,000 |
| | Hitz | $9.990 | 200,000 |
| | Lau | $9.990 | 200,000 |

[2] The exercise price and the number of options purportedly granted on April 30, 1997 have been adjusted for the Company's 2-for-1 stock split effective December 19, 1997.

[3] The exercise price and the number of options purportedly granted on July 17, 1997 have been adjusted for the Company's 2-for-1 stock split effective December 19, 1997.

[4] The exercise price and the number of options purportedly granted on November 2, 1998 have been adjusted for the Company's 2-for-1 stock split effective December 22, 1998.

[5] The exercise price and the number of options purportedly granted on May 24, 1999 have been adjusted for the Company's 2-for-1 stock splits effective December 21, 1999 and March 23, 2000.

[6] The exercise price and the number of options purportedly granted on February 1, 2000 have been adjusted for the Company's 2-for-1 stock split effective March 23, 2000.

| | | | |
|---|---|---|---|
| | Mendoza | $9.990 | 250,000 |

42. Pursuant to the terms of the Company's shareholder-approved stock option plans, including the 1999 Stock Option Plan and 1995 Stock Incentive Plan, the exercise price of options "shall not be less than one hundred percent (100%) of the Fair Market Value per share of Common Stock on the option grant date," where Fair Market Value is defined as "the closing selling price per share of Common Stock on the date in question," and "[i]f there is no closing selling price for the Common Stock on the date in question, then . . . the closing selling price on the last preceding date for which such quotation exists."

43. Pursuant to APB 25, the applicable GAAP provision at the time of the foregoing stock option grants, if the market price on the date of grant exceeds the exercise price of the options, the company must recognize the difference as an expense.

44. Pursuant to Section 162(m) of the Internal Revenue Code, 26 U.S.C. § 162(m) ("Section 162(m)"), compensation in excess of $1 million per year, including gains on stock options, paid to a corporation's five most highly-compensated officers is tax deductible only if: (i) the compensation is payable solely on account of the attainment of one or more performance goals; (ii) the performance goals are determined by a compensation committee comprised solely of two or more outside directors, (iii) the material terms under which the compensation is to be paid, including the performance goals, are disclosed to shareholders and approved by a majority of the vote in a separate shareholder vote before the payment of the compensation, and (iv) before any payment of such compensation, the compensation committee certifies that the performance goals and any other material terms were in fact satisfied.

45. In a striking pattern that could not have been the result of chance, each and every one of the foregoing stock option grants was dated just before a substantial rise in Network Appliance's stock price, and a majority of the stock option grants followed a sharp drop in price, as demonstrated in the following charts:

/ / /

/ / /

(a) Summary of Option Grants and Surrounding Stock Price Performance

| Purported Date of Grant | Exercise Price | Stock Price 10 Trading Days Before Purported Grant Date | Stock Price 10 Trading Days After Purported Grant Date | % Rise in Stock Price After Purported Grant Date |
|---|---|---|---|---|
| 08/01/96 | $21.750 | $26.000 | $28.250 | 29.89% |
| 10/23/96 | $31.500 | $29.500 | $35.500 | 12.70% |
| 04/01/97 | $31.120 | $37.250 | $36.000 | 15.68% |
| 04/30/97[7] | $14.560 | $17.375 | $19.875 | 36.50% |
| 07/17/97[8] | $18.940 | $19.940 | $21.810 | 15.15% |
| 11/02/98[9] | $28.440 | $25.250 | $33.190 | 16.70% |
| 05/24/99[10] | $11.250 | $12.405 | $12.250 | 8.89% |
| 10/26/99 | $66.620 | $72.560 | $99.500 | 49.35% |
| 02/01/00 | $53.910 | $59.060 | $75.780 | 40.57% |
| 05/10/00 | $58.000 | $61.120 | $65.060 | 12.17% |
| 04/26/01 | $20.160 | $16.560 | $24.010 | 19.10% |
| 02/07/02 | $15.320 | $18.240 | $16.700 | 9.01% |
| 08/12/02 | $7.450 | $9.140 | $10.640 | 42.82% |
| 11/01/02 | $9.990 | $8.080 | $11.070 | 10.81% |

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

[7] The exercise price and closing prices pertinent to the options purportedly granted on April 30, 1997 have been adjusted for the Company's 2-for-1 stock split effective December 19, 1997.

[8] The exercise price and closing prices pertinent to the options purportedly granted on July 17, 1997 have been adjusted for the Company's 2-for-1 stock split effective December 19, 1997.

[9] The exercise price and closing prices pertinent to the options purportedly granted on November 2, 1998 have been adjusted for the Company's 2-for-1 stock split effective December 22, 1998.

[10] The exercise price and closing prices pertinent to the options purportedly granted on May 24, 1999 have been adjusted for the Company's 2-for-1 stock splits effective December 21, 1999 and March 23, 2000.

(b) Stock Price Performance Surrounding Options Grant Purportedly Dated 08/01/96




(c) Stock Price Performance Surrounding Options Grant Purportedly Dated 10/23/96




(d) Stock Price Performance Surrounding Options Grant Purportedly Dated 04/01/97



(e) Stock Price Performance Surrounding Options Grant Purportedly Dated 04/30/97[11]




(f) Stock Price Performance Surrounding Options Grant Purportedly Dated 07/17/97[12]




/ / /

/ / /

/ / /

/ / /

/ / /

---

[11] The exercise price and closing prices pertinent to the options purportedly granted on April 30, 1997 have been adjusted for the Company's 2-for-1 stock split effective December 19, 1997.

[12] The exercise price and closing prices pertinent to the options purportedly granted on July 17, 1997 have been adjusted for the Company's 2-for-1 stock split effective December 19, 1997.

(g) Stock Price Performance Surrounding Options Grant Purportedly Dated 11/02/98[13]




(h) Stock Price Performance Surrounding Options Grant Purportedly Dated 05/24/99[14]




/ / /

/ / /

/ / /

/ / /

/ / /

---

[13] The exercise price and closing prices pertinent to the options purportedly granted on November 2, 1998 have been adjusted for the Company's 2-for-1 stock split effective December 22, 1998.

[14] The exercise price and closing prices pertinent to the options purportedly granted on May 24, 1999 have been adjusted for the Company's 2-for-1 stock splits effective December 21, 1999 and March 23, 2000.

(i) Stock Price Performance Surrounding Options Grant Purportedly Dated 10/26/99




(j) Stock Price Performance Surrounding Options Grant Purportedly Dated 02/01/00[15]




/ / /

/ / /

/ / /

[15] The exercise price and closing prices pertinent to the options purportedly granted on February 1, 2000 have been adjusted for the Company's 2-for-1 stock split effective March 23, 2000.

(k) Stock Price Performance Surrounding Options Grant Purportedly Dated 05/10/00




(l) Stock Price Performance Surrounding Options Grant Purportedly Dated 04/26/01




(m) Stock Price Performance Surrounding Options Grant Purportedly Dated 02/07/02



(n) Stock Price Performance Surrounding Options Grant Purportedly Dated 08/12/02




(o) Stock Price Performance Surrounding Options Grant Purportedly Dated 11/01/02




46. The reason for the extraordinary pattern set forth in the preceding paragraph is that the purported grant dates set forth therein were not the actual dates on which the stock option grants were made. Rather, at the behest of the Option Recipient Defendants, the Director Defendants improperly backdated the stock option grants to make it appear as though the grants were made on dates when the market price of Network Appliance stock was lower than the market price on the actual grant dates. This improper backdating, which violated the terms of the Company's shareholder-approved stock option plans, resulted in option grants with lower exercise prices, which improperly increased the value of the options to the Option Recipient Defendants and improperly reduced the amounts the Option Recipient Defendants had to pay the Company upon exercise of the options.

47. According to a statistical analysis conducted by Plaintiff, there is a 99.4% likelihood that the fortuitous pattern of option grants alleged herein was not the result of random chance. Indeed, the only explanation that is consistent with the observed pattern is that the options were backdated to coincide with favorable dates when the price of Network Appliance's stock was particularly low.

48. The Individual Defendants' backdating of stock options was particularly egregious in fiscal 1997, 1998, 1999, 2000, 2001, and 2002 when they backdated options to coincide with some of Network Appliance's lowest closing prices of those respective years, as demonstrated in the following charts:

(a) Closing Stock Prices of Fiscal Year Ended April 25, 1997




/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

(b) Closing Stock Prices of Fiscal Year Ended April 24, 1998[16]




(c) Closing Stock Prices of Fiscal Year Ended April 30, 1999[17]




/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

[16] The exercise prices and closing prices pertinent to the options purportedly granted on April 20, 1997 and July 17, 1997 have been adjusted for the Company's 2-for-1 stock split effective December 19, 1997.

[17] The exercise prices and closing prices pertinent to the options purportedly granted on November 2, 1998 have been adjusted for the Company's 2-for-1 stock split effective December 22, 1998.

(d) Closing Stock Prices of Fiscal Year Ended April 28, 2000[18]




(e) Closing Stock Prices of Fiscal Year Ended April 28, 2000[19]




/ / /

/ / /

/ / /

/ / /

/ / /

[18] The exercise prices and closing prices pertinent to the options purportedly granted on May 24, 1999 and February 1, 2000 have been adjusted for the Company's 2-for-1 stock splits effective December 21, 1999 and March 23, 2000.

[19] The exercise prices and closing prices pertinent to the options purportedly granted on October 26, 1999 have not been adjusted for the Company's 2-for-1 stock splits effective December 21, 1999 and March 23, 2000.

(f) Closing Stock Prices of Fiscal Year Ended April 27, 2001




(g) Closing Stock Prices of Fiscal Year Ended April 25, 2003




49. The Individual Defendants' backdating of stock options also coincided with some of Network Appliance's lowest prices for certain fiscal quarters, as demonstrated in the following charts:

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

(a) Stock Price Performance in the Second Fiscal Quarter of Fiscal 1997




(b) Stock Price Performance in the Third Fiscal Quarter of Fiscal 1997




(c) Stock Price Performance in the Fourth Fiscal Quarter of Fiscal 1997



(d) Stock Price Performance in the First Fiscal Quarter of Fiscal 1998[20]




(e) Stock Price Performance in the Third Fiscal Quarter of Fiscal 1999[21]




/ / /

/ / /

/ / /

/ / /

/ / /

[20] The exercise price and closing prices pertinent to stock options purportedly granted on April 30, 1997 have been adjusted for the Company's 2-for-1 split effective on December 19, 1997.

[21] The exercise price and closing prices pertinent to stock options purportedly granted on November 2, 1998 have been adjusted for the Company's 2-for-1 split effective on December 22, 1998.

(f) Stock Price Performance in the First Fiscal Quarter of Fiscal 2000[22]




(g) Stock Price Performance in the Fourth Fiscal Quarter of Fiscal 2000[23]




/ / /

/ / /

/ / /

/ / /

/ / /

---

[22] The exercise price and closing prices pertinent to stock options purportedly granted on May 24, 1999 have been adjusted for the Company's 2-for-1 stock splits effective on December 21, 1999 and March 23, 2000.

[23] The exercise price and closing prices pertinent to stock options purportedly granted on February 1, 2000 have been adjusted for the Company's 2-for-1 stock split effective on March 23, 2000.

(h) Stock Price Performance in the First Fiscal Quarter of Fiscal 2001




(i) Stock Price Performance in the Fourth Fiscal Quarter of Fiscal 2001




(j) Stock Price Performance in the Fourth Fiscal Quarter of 2002



(k) Stock Price Performance in the Second Fiscal Quarter of Fiscal 2003




(l) Stock Price Performance in the Third Fiscal Quarter of Fiscal 2003




50. Prior to the enactment of the Sarbanes-Oxley Act of 2002 ("SOX"), the Individual Defendants were able to engage in backdating of option grants with relative ease because under federal law they were only required to report option grants to the SEC once a year.

51. Pursuant to SOX, beginning on August 29, 2002, executives are required to report option grants to the SEC within two days of the grant.

52. Following the enactment of SOX, the Individual Defendants continued to backdate stock option grants. Specifically, the Compensation Committee granted certain of the Option Recipient Defendants backdated Network Appliance stock options with a purported grant date of November 1, 2002.

53. Although the Option Recipient Defendants who received the foregoing option grants were required to report them to the SEC within two days of the grants, they did not do so. In fact, Warmenhoven, Allen, Hitz, Lau and Mendoza did not report their purported November 1, 2002 option grant.

**The Individual Defendants' Dissemination of False Financial Statements**

54. As a result of the improper backdating of stock options, the Company, with the knowledge, approval, and participation of each of the Individual Defendants,

(a) violated the terms of the Company's shareholder-approved stock option plans by granting stock options with exercise prices less than the fair market value of the stock on the actual date of grant;

(b) violated APB by failing to recognize compensation expenses incurred when the improperly backdated options were granted;

(c) violated Section 162(m) by taking tax deductions based on stock option grants that were not payable solely on account of the attainment of one or more performance goals and violated the terms of the Company's shareholder-approved stock option plans; and

(d) produced and disseminated to Network Appliance shareholders and the market false financial statements that improperly recorded and accounted for the backdated option grants, and thereby understated compensation expenses and overstated net income.

55. The Company, with the knowledge, approval, and participation of each of the Individual Defendants, disseminated its false financial statements in, *inter alia*, the following Form 10-K filings:

(a) Form 10-K405 for the fiscal year ended April 26, 1996, filed with the SEC on July 25, 1996 and signed by defendants Warmenhoven, Valentine, Bartz, and Wall;

(b) Form 10-K for the fiscal year ended April 25, 1997, filed with the SEC on July 23, 1997 and signed by defendants Warmenhoven, Valentine, Allen, Bartz, and Wall;

(c) Form 10-K for the fiscal year ended April 24, 1998, filed with the SEC on July 22, 1998 and signed by defendants Warmenhoven, Valentine, Allen, Bartz, and Wall;

(d) Form 10-K for the fiscal year ended April 30, 1999, filed with the SEC on July 12, 1999 and signed by defendants Warmenhoven, Valentine, Allen, Bartz, and Wall;

(e) Form 10-K for the fiscal year ended April 28, 2000, filed with the SEC on July 12, 2000 and signed by defendants Warmenhoven, Valentine, Allen, Bartz, Wall, and Semmoto;

(f) Form 10-K for the fiscal year ended April 27, 2001, filed with the SEC on July 26, 2001 and signed by defendants Warmenhoven, Valentine, Allen, Bartz, Wall, and Semmoto;

(g) Form 10-K for the fiscal year ended April 26, 2002, filed with the SEC on June 28, 2002 and signed by defendants Warmenhoven, Valentine, Allen, Bartz, Moore, Wall, and Semmoto;

(h) Form 10-K for the fiscal year ended April 25, 2003, filed with the SEC on June 25, 2003 and signed by defendants Warmenhoven, Valentine, Gomo, Bartz, Moore, Wall, and Semmoto;

(i) Form 10-K for the fiscal year ended April 30, 2004, filed with the SEC on June 29, 2004 and signed by defendants Warmenhoven, Valentine, Gomo, Bartz, Moore, Wall, Semmoto, and Shaheen;

(j) Form 10-K for the fiscal year ended April 20, 2005, filed with the SEC on July 8, 2005 and signed by defendants Warmenhoven, Valentine, Gomo, Earhart, Bartz, Moore, Leslie, Wall, Semmoto, Shaheen, and Allen;

(k) Form 10-K for the fiscal year ended April 30, 2006, filed with the SEC on July 12, 2006 and signed by defendants Warmenhoven, Valentine, Gomo, Earhart, Bartz, Moore, Leslie, Wall, Semmoto, Shaheen, and Allen.

**<u>The Individual Defendants' Concealment of Their Misconduct</u>**

56. From 1997 to 2006, the Company, with the knowledge, approval, and participation of each of the Individual Defendants, for the purpose and with the effect of concealing the

improper option backdating, disseminated to shareholders and filed with the SEC annual proxy statements that falsely reported the dates of stock option grants to the Option Recipient Defendants and falsely stated that the exercise price of the options granted to the Option Recipient Defendants must "not [be] less than the fair market value of those shares on the grant date," as follows:

(a) Network Appliance's proxy statement filed with the SEC on August 8, 1997 falsely reported that options granted to Mendoza, Bradley, and Simmons were granted on April 1, 1997 and other options granted to Simmons were granted on August 1, 1996;

(b) Network Appliance's proxy statement filed with the SEC on August 21, 1998 falsely reported that options granted to Warmenhoven were granted on April 30, 1997 and options granted to Bradley and Mendoza were granted on July 17, 1997;

(c) Network Appliance's proxy statement filed with the SEC on August 27, 1999 falsely reported that options granted to Simmons were granted on November 2, 1998;

(d) Network Appliance's proxy statement filed with the SEC on August 25, 2000 falsely reported that options granted to Warmenhoven, Allen, Hitz, Mendoza, and Simmons were granted on February 1, 2000 and other options granted to Warmenhoven, Allen, Hitz, and Mendoza were granted on May 24, 1999;

(e) Network Appliance's proxy statement filed with the SEC on August 24, 2001 falsely reported that that options granted to Mendoza were granted on May 10, 2000 and options granted to Warmenhoven, Allen, Hitz, Lau, and Mendoza were granted on April 26, 2001;

(f) Network Appliance's proxy statement filed with the SEC on July 10, 2002 falsely reported that options granted to Warmenhoven, Allen, Hitz, Lau, and Mendoza were granted on February 7, 2002; and

(g) Network Appliance's proxy statement filed with the SEC on July 10, 2003 falsely reported that options granted to Warmenhoven, Allen, Hitz, Lau, and Mendoza were granted on November 1, 2002.

57. From 2003 to 2006, the Company, with the knowledge, approval, and participation of each of the Individual Defendants, for the purpose and with the effect of concealing the improper option backdating, filed with the SEC Form 4's that falsely reported the dates of stock option grants to the Option Recipient Defendants, as follows:

(a) Lau's Form 4 filed with the SEC on August 29, 2003 falsely reported that options granted to Lau had been granted on April 1, 1997;

(b) Warmenhoven's Form 4 filed with the SEC on December 9, 2003 falsely reported that options granted to Warmenhoven had been granted on April 30, 1997;

(c) Gomo's Form 4 filed with the SEC on September 7, 2004 falsely reported that options granted to Gomo had been granted on August 12, 2002;

(d) Allen's Form 4 filed with the SEC on December 3, 2004 falsely reported that options granted to Allen had been granted on December 2, 1996;

(e) Mendoza's Form 4 filed with the SEC on December 7, 2004 falsely reported that options granted to Mendoza had been granted on July 17, 1997 and February 7, 2002;

(f) Gomo's Form 4 filed with the SEC on December 7, 2004 falsely reported that options granted to Gomo had been granted on August 12, 2002;

(g) Mendoza's Form 4 filed with the SEC on December 8, 2004 falsely reported that options granted to Mendoza had been granted on February 7, 2002 and November 1, 2002;

(h) Mendoza's Form 4 filed with the SEC on December 9, 2004 falsely reported that options granted to Mendoza had been granted on April 26, 2001;

(i) Warmenhoven's Form 4 filed with the SEC on December 9, 2004 falsely reported that options granted to Warmenhoven had been granted on April 30, 1997;

(j) Semmoto's Form 4 filed with the SEC on December 13, 2004 falsely reported that options granted to Semmoto had been granted on February 7, 2002;

(k) Mendoza's Form 4's filed with the SEC on December 15, 2004, December 13, 2004, and December 10, 2004 falsely reported that options granted to Mendoza had been granted on May 24, 1999;

(l) Mendoza's Form 4 filed with the SEC on December 16, 2004 falsely reported that options granted to Mendoza had been granted on April 26, 2001;

(m) Allen's Form 4 filed with the SEC on December 22, 2004 falsely reported that options granted to Allen had been granted on May 24, 1999;

(n) Mendoza's Form 4 filed with the SEC on December 23, 2004 falsely reported that options granted to Mendoza had been granted on May 24, 1999;

(o) Allen's Form 4 filed with the SEC on June 20, 2005 falsely reported that options granted to Allen had been granted on May 24, 1999;

(p) Lau's Form 4 filed with the SEC on June 20, 2005 falsely reported that options granted to Lau had been granted on November 1, 2002;

(q) Bartz's Form 4 filed with the SEC on June 21, 2005 falsely reported that options granted to Bartz had been granted on October 26, 1999;

(r) Lau's Form 4 filed with the SEC on June 24, 2005 falsely reported that options granted to Lau had been granted on May 24, 1999;

(s) Allen's Form 4 filed with the SEC on August 22, 2005 falsely reported that options granted to Allen had been granted on May 24, 1999 and November 1, 2002;

(t) Allen's Form 4 filed with the SEC on November 21, 2005 falsely reported that options granted to Allen had been granted on May 24, 1999 and April 26, 2001;

(u) Lau's Form 4 filed with the SEC on November 30, 2005 falsely reported that options granted to Lau had been granted on May 24, 1999 and November 1, 2002;

(v) Mendoza's Form 4 filed with the SEC on December 27, 2005 falsely reported that options granted to Mendoza had been granted on November 1, 2002;

(w) Semmoto's Form 4 filed with the SEC on March 21, 2006 falsely reported that options granted to Semmoto had been granted on February 7, 2002;

(x) Allen's Form 4 filed with the SEC on March 16, 2006 falsely reported that options granted to Allen had been granted on May 24, 1999 and November 1, 2002;

(y) Mendoza's Form 4 filed with the SEC on March 20, 2006 falsely reported that options granted to Mendoza had been granted on May 24, 1999, April 26, 2001, February 7, 2002, and November 1, 2002;

(z) Lau's Form 4 filed with the SEC on March 21, 2006 falsely reported that options granted to Lau had been granted on May 24, 1999;

(aa) Hitz's Form 4 filed with the SEC on March 21, 2006 falsely reported that options granted to Hitz had been granted on May 24, 1999;

(bb) Allen's Form 4 filed with the SEC on April 19, 2006 falsely reported that options granted to Allen had been granted on April 26, 2001;

(cc) Hitz's Form 4's filed with the SEC on April 24, 2006 and May 12, 2006 falsely reported that options granted to Hitz had been granted on May 24, 1999;

(dd) Valentine's Form 4 filed with the SEC on August 21, 2006 falsely reported that options granted to Valentine had been granted on October 23, 1996;

(ee) Allen's Form 4 filed with the SEC on August 28, 2006 falsely reported that options granted to Allen had been granted on February 7, 2002 and November 1, 2002;

(ff) Gomo's Form 4 filed with the SEC on September 6, 2006 falsely reported that options granted to Gomo had been granted on August 12, 2002;

(gg) Lau's Form 4's filed with the SEC on September 21, 2006, September 19, 2006, and September 5, 2006 falsely reported that options granted to Lau had been granted on May 24, 1999;

58. The Individual Defendants have continued to conceal their foregoing misconduct. It has only been brought to light as a result of this Complaint filed against them for backdating Network Appliance stock option grants to the Option Recipient Defendants.

**<u>The Individual Defendants' Insider Selling</u>**

59. During the relevant period, certain of the Individual Defendants (collectively, the "Insider Selling Defendants"), while in possession of materially adverse non-public information

regarding the backdating of stock options and the false financial statements resulting therefrom, sold more than $427 million in Network Appliance stock, a significant portion of which was obtained through the exercise of improperly backdated stock options, as demonstrated below:

| NAME | DATE OF TRANSACTION | NUMBER OF SHARES SOLD | PRICE/SHARE | PROCEEDS |
|---|---|---|---|---|
| Allen | 08/22/03 | 200,000 | $21.87 | $4,373,000.00 |
| | 11/21/03 | 200,000 | $21.74 | $4,347,600.00 |
| | 03/02/04 | 200,000 | $22.09 | $4,417,740.00 |
| | 05/21/04 | 200,000 | $18.67 | $3,734,000.00 |
| | 05/26/04 | 149,032 | $20.13 | $3,000,014.16 |
| | 08/20/04 | 200,000 | $19.80 | $3,959,400.00 |
| | 12/03/04 | 200,000 | $32.83 | $6,566,400.00 |
| | 02/17/05 | 200,000 | $31.29 | $6,257,200.00 |
| | 06/17/05 | 200,000 | $30.10 | $6,020,860.00 |
| | 09/19/05 | 200,000 | $24.14 | $4,827,620.00 |
| | 11/18/05 | 200,000 | $29.13 | $5,826,700.00 |
| | 03/15/06 | 196,684 | $34.04 | $6,695,379.05 |
| | 08/25/06 | 200,000 | $33.91 | $6,781,620.00 |
| | **Total Shares Sold =** | **2,545,716** | **Total Proceeds =** | **$66,807,533.21** |
| Bartz | 08/25/03 | 192,000 | $21.20 | $4,070,400.00 |
| | 12/21/04 | 96,000 | $33.95 | $3,259,200.00 |
| | 06/17/05 | 40,000 | $30.05 | $1,202,196.00 |
| | 03/28/06 | 30,000 | $35.26 | $1,057,659.00 |
| | **Total Shares Sold =** | **358,000** | **Total Proceeds =** | **$9,589,455.00** |
| Gomo | 12/03/04 | 100,000 | $33.26 | $3,326,400.00 |
| | 09/05/06 | 2,000 | $34.28 | $68,550.00 |
| | 09/05/06 | 100,000 | $34.34 | $3,434,250.00 |
| | **Total Shares Sold =** | **202,000** | **Total Proceeds =** | **$6,829,200.00** |
| Hitz | 08/27/03 | 200,000 | $21.97 | $4,394,000.00 |
| | 11/24/03 | 200,000 | $22.90 | $4,580,940.00 |
| | 02/24/04 | 70,000 | $21.70 | $1,518,755.00 |
| | 02/25/04 | 65,000 | $21.96 | $1,427,562.50 |
| | 03/24/04 | 30,000 | $20.25 | $607,359.00 |
| | 04/06/04 | 30,000 | $22.42 | $672,570.00 |
| | 04/22/04 | 30,000 | $21.63 | $649,023.00 |
| | 05/04/04 | 30,000 | $19.07 | $572,103.00 |
| | 05/21/04 | 30,000 | $18.68 | $560,400.00 |
| | 06/03/04 | 30,000 | $19.13 | $573,987.00 |
| | 06/14/04 | 30,000 | $19.11 | $573,192.00 |

| | | | |
|---|---|---|---|
| 06/30/04 | 30,000 | $21.49 | $644,811.00 |
| 07/15/04 | 30,000 | $17.99 | $539,610.00 |
| 07/26/04 | 30,000 | $18.15 | $544,575.00 |
| 08/11/04 | 30,000 | $16.61 | $498,150.00 |
| 08/23/04 | 30,000 | $20.00 | $600,003.00 |
| 09/09/04 | 30,000 | $21.53 | $645,810.00 |
| 09/20/04 | 30,000 | $23.01 | $690,150.00 |
| 10/07/04 | 30,000 | $24.40 | $732,108.00 |
| 10/22/04 | 30,000 | $23.69 | $710,670.00 |
| 11/03/04 | 30,000 | $25.83 | $774,870.00 |
| 11/16/04 | 30,000 | $25.07 | $752,040.00 |
| 12/02/04 | 30,000 | $33.61 | $1,008,300.00 |
| 12/13/04 | 30,000 | $32.92 | $987,510.00 |
| 12/28/04 | 30,000 | $32.04 | $961,080.00 |
| 01/13/05 | 30,000 | $31.91 | $957,189.00 |
| 01/27/05 | 30,000 | $30.85 | $925,455.00 |
| 02/10/05 | 30,000 | $30.80 | $923,865.00 |
| 02/24/05 | 30,000 | $29.58 | $887,310.00 |
| 03/09/05 | 30,000 | $30.31 | $909,360.00 |
| 04/21/05 | 25,000 | $26.83 | $670,752.50 |
| 05/09/05 | 2,978 | $28.23 | $84,068.94 |
| 05/10/05 | 25,000 | $27.55 | $688,757.50 |
| 06/09/05 | 25,000 | $29.53 | $738,315.00 |
| 06/20/05 | 25,000 | $29.88 | $747,075.00 |
| 07/05/05 | 35,000 | $28.39 | $993,576.50 |
| 07/06/05 | 25,000 | $27.96 | $699,060.00 |
| 07/19/05 | 25,000 | $28.53 | $713,235.00 |
| 08/01/05 | 25,000 | $26.20 | $654,935.00 |
| 08/17/05 | 25,000 | $24.16 | $603,930.00 |
| 09/02/05 | 25,000 | $23.41 | $585,182.50 |
| 09/15/05 | 25,000 | $22.77 | $569,342.50 |
| 10/27/05 | 25,000 | $25.72 | $642,925.00 |
| 11/10/05 | 25,000 | $27.21 | $680,225.00 |
| 11/22/05 | 25,000 | $28.94 | $723,385.00 |
| 12/01/05 | 25,000 | $29.40 | $735,007.50 |
| 12/15/05 | 25,000 | $29.72 | $742,982.50 |
| 12/28/05 | 25,000 | $27.69 | $692,362.50 |
| 01/10/06 | 25,000 | $28.67 | $716,625.00 |
| 01/25/06 | 25,000 | $30.68 | $767,045.00 |
| 02/22/06 | 25,000 | $33.34 | $833,405.00 |
| 03/06/06 | 25,000 | $34.03 | $850,752.50 |
| 03/22/06 | 25,000 | $34.73 | $868,260.00 |

| | | | | |
|---|---|---|---|---|
| | 04/05/06 | 25,000 | $36.58 | $914,432.50 |
| | 04/05/06 | 25,000 | $36.57 | $914,340.00 |
| | 04/20/06 | 25,000 | $37.93 | $948,207.50 |
| | 05/09/06 | 3,418 | $37.02 | $126,534.36 |
| | 05/10/06 | 25,000 | $36.18 | $904,532.50 |
| | **Total Shares Sold =** | **1,981,396** | **Total Proceeds =** | **$50,632,009.80** |
| Lau | 08/22/03 | 100,000 | $21.82 | $2,182,000.00 |
| | 08/28/03 | 50,000 | $22.23 | $1,111,500.00 |
| | 08/29/03 | 75,000 | $22.34 | $1,675,230.00 |
| | 09/03/03 | 15,000 | $23.58 | $353,700.00 |
| | 09/03/03 | 15,000 | $23.58 | $353,700.00 |
| | 11/24/03 | 150,000 | $23.00 | $3,449,250.00 |
| | 12/26/03 | 20,000 | $20.75 | $415,000.00 |
| | 12/26/03 | 20,000 | $20.78 | $415,600.00 |
| | 02/26/04 | 14,924 | $21.97 | $327,811.63 |
| | 02/27/04 | 9,454 | $22.00 | $207,988.00 |
| | 03/01/04 | 61,790 | $21.95 | $1,356,290.50 |
| | 03/02/04 | 13,832 | $22.00 | $304,304.00 |
| | 03/04/04 | 5,907 | $22.25 | $131,430.75 |
| | 03/05/04 | 54,093 | $22.26 | $1,204,066.91 |
| | 05/26/04 | 40,000 | $20.03 | $801,200.00 |
| | 06/04/04 | 25,000 | $19.51 | $487,650.00 |
| | 06/07/04 | 25,000 | $20.03 | $500,730.00 |
| | 06/18/04 | 25,000 | $19.60 | $490,000.00 |
| | 06/21/04 | 19,850 | $19.55 | $388,067.50 |
| | 06/22/04 | 25,000 | $19.50 | $487,500.00 |
| | 07/29/04 | 33,000 | $18.86 | $622,370.10 |
| | 08/24/04 | 33,000 | $20.19 | $666,289.80 |
| | 08/31/04 | 50,000 | $19.88 | $993,750.00 |
| | 09/21/04 | 8,449 | $23.25 | $196,439.25 |
| | 09/21/04 | 8,449 | $23.25 | $196,439.25 |
| | 09/21/04 | 7,217 | $23.25 | $167,795.25 |
| | 09/21/04 | 9,681 | $23.25 | $225,083.25 |
| | 09/24/04 | 1,551 | $23.25 | $36,060.75 |
| | 09/24/04 | 1,551 | $23.25 | $36,060.75 |
| | 09/24/04 | 33,000 | $22.97 | $757,944.00 |
| | 10/28/04 | 33,000 | $23.83 | $786,324.00 |
| | 11/30/04 | 33,000 | $30.04 | $991,419.00 |
| | 12/03/04 | 6,000 | $33.14 | $198,822.00 |
| | 12/03/04 | 6,000 | $33.14 | $198,822.00 |
| | 12/09/04 | 20,000 | $33.21 | $664,140.00 |
| | 12/10/04 | 10,000 | $33.50 | $335,010.00 |

| | | | |
|---|---|---|---|
| 12/10/04 | 20,000 | $32.97 | $659,460.00 |
| 12/15/04 | 38,723 | $34.20 | $1,324,326.60 |
| 12/17/04 | 40,000 | $34.25 | $1,370,000.00 |
| 12/29/04 | 33,000 | $32.63 | $1,076,691.00 |
| 12/30/04 | 20,000 | $33.00 | $660,000.00 |
| 12/31/04 | 30,000 | $33.00 | $990,000.00 |
| 01/25/05 | 33,000 | $30.53 | $1,007,556.00 |
| 02/24/05 | 30,000 | $29.58 | $887,310.00 |
| 03/30/05 | 33,000 | $27.20 | $897,649.50 |
| 04/27/05 | 33,000 | $26.56 | $876,463.50 |
| 05/23/05 | 33,000 | $30.26 | $998,530.50 |
| 05/27/05 | 25,000 | $28.96 | $724,005.00 |
| 06/16/05 | 50,000 | $30.00 | $1,500,000.00 |
| 06/17/05 | 50,000 | $30.20 | $1,510,000.00 |
| 06/23/05 | 50,000 | $30.05 | $1,502,500.00 |
| 06/30/05 | 33,000 | $28.61 | $943,974.90 |
| 08/02/05 | 35,000 | $25.94 | $907,742.50 |
| 09/27/05 | 25,000 | $23.96 | $598,992.50 |
| 10/12/05 | 25,000 | $23.45 | $586,305.00 |
| 10/26/05 | 35,000 | $25.96 | $908,554.50 |
| 11/02/05 | 35,000 | $27.43 | $959,994.00 |
| 11/18/05 | 7,000 | $29.83 | $208,810.00 |
| 11/18/05 | 4,500 | $29.75 | $133,875.00 |
| 11/29/05 | 16,400 | $29.54 | $484,472.40 |
| 11/29/05 | 16,400 | $29.54 | $484,472.40 |
| 11/29/05 | 38,500 | $29.56 | $1,137,944.50 |
| 11/29/05 | 50,000 | $29.77 | $1,488,525.00 |
| 11/29/05 | 1,640 | $29.75 | $48,790.00 |
| 12/06/05 | 35,000 | $29.41 | $1,029,469.00 |
| 12/12/05 | 100,000 | $29.52 | $2,952,430.00 |
| 01/05/06 | 35,000 | $28.14 | $984,935.00 |
| 02/23/06 | 35,000 | $32.88 | $1,150,628.50 |
| 03/06/06 | 35,000 | $34.03 | $1,191,053.50 |
| 03/20/06 | 60,000 | $35.20 | $2,112,168.00 |
| 04/26/06 | 35,000 | $36.97 | $1,293,904.50 |
| 05/04/06 | 35,000 | $36.79 | $1,287,762.00 |
| 06/02/06 | 35,000 | $32.38 | $1,133,205.50 |
| 07/05/06 | 35,000 | $34.45 | $1,205,851.50 |
| 08/02/06 | 35,000 | $30.00 | $1,050,000.00 |
| 09/01/06 | 25,000 | $34.51 | $862,685.00 |
| 09/07/06 | 35,000 | $33.68 | $1,178,810.50 |
| 09/18/06 | 25,000 | $34.78 | $869,620.00 |

| | | | | |
|---|---|---|---|---|
| | 09/21/06 | 40,000 | $36.84 | $1,473,684.00 |
| | **Total Shares Sold =** | **2,499,911** | **Total Proceeds =** | **$68,368,940.49** |
| Leslie | 06/14/06 | 311 | $32.57 | $10,129.27 |
| | 06/15/06 | 582 | $34.18 | $19,892.24 |
| | **Total Shares Sold =** | **893** | **Total Proceeds =** | **$30,021.51** |
| Mendoza | 08/22/03 | 250,000 | $22.33 | $5,582,500.00 |
| | 02/26/04 | 178,000 | $21.91 | $3,899,980.00 |
| | 02/27/04 | 22,000 | $21.90 | $481,800.00 |
| | 06/07/04 | 50,000 | $20.00 | $1,000,000.00 |
| | 06/18/04 | 50,000 | $19.55 | $977,500.00 |
| | 08/23/04 | 100,000 | $20.05 | $2,005,000.00 |
| | 09/21/04 | 50,000 | $23.00 | $1,150,000.00 |
| | 12/03/04 | 218,775 | $32.52 | $7,114,781.78 |
| | 12/06/04 | 241,666 | $32.31 | $7,809,195.12 |
| | 12/07/04 | 262,500 | $33.71 | $8,849,662.50 |
| | 12/08/04 | 262,224 | $33.08 | $8,674,632.14 |
| | 12/09/04 | 260,000 | $32.16 | $8,362,120.00 |
| | 12/13/04 | 260,000 | $32.98 | $8,574,800.00 |
| | 12/13/04 | 4,835 | $32.75 | $158,346.25 |
| | 12/15/04 | 315,623 | $34.56 | $10,907,930.88 |
| | 06/23/05 | 81,120 | $30.08 | $2,439,757.01 |
| | 06/24/05 | 224,043 | $29.10 | $6,518,575.89 |
| | 11/23/05 | 250,000 | $29.15 | $7,287,475.00 |
| | 12/27/05 | 42,011 | $28.13 | $1,181,769.43 |
| | 03/17/06 | 335,000 | $35.11 | $11,761,347.50 |
| | 03/20/06 | 25,167 | $35.12 | $883,865.04 |
| | 08/30/06 | 76,856 | $34.57 | $2,656,604.50 |
| | 08/31/06 | 79,796 | $34.56 | $2,757,861.47 |
| | 09/19/06 | 38,000 | $36.06 | $1,370,280.00 |
| | 09/20/06 | 62,000 | $36.16 | $2,241,920.00 |
| | **Total Shares Sold =** | **3,739,616** | **Total Proceeds =** | **$114,647,704.52** |
| Moore | 12/07/04 | 35,000 | $33.66 | $1,178,205.00 |
| | 03/24/06 | 20,000 | $35.10 | $702,000.00 |
| | **Total Shares Sold =** | **55,000** | **Total Proceeds =** | **$1,880,205.00** |
| Semmoto | 08/31/06 | 15,000 | $34.50 | $517,500.00 |
| | **Total Shares Sold =** | **15,000** | **Total Proceeds =** | **$517,500.00** |
| Valentine | 12/14/04 | 20,000 | $33.10 | $661,940.00 |
| | 08/18/06 | 96,000 | $33.09 | $3,176,217.60 |
| | **Total Shares Sold =** | **116,000** | **Total Proceeds =** | **$3,838,157.60** |
| Wall | 09/03/03 | 80,000 | $23.23 | $1,858,400.00 |
| | 09/04/03 | 80,000 | $23.41 | $1,872,800.00 |
| | 09/05/03 | 40,000 | $23.52 | $940,800.00 |
| | 12/18/03 | 50,000 | $20.17 | $1,008,500.00 |

| | | | | |
|---|---|---|---|---|
| | 12/22/03 | 100,000 | $19.83 | $1,983,000.00 |
| | 12/23/03 | 200,000 | $20.31 | $4,062,000.00 |
| | 03/25/04 | 203,000 | $20.98 | $4,258,940.00 |
| | 03/26/04 | 65,000 | $21.22 | $1,379,300.00 |
| | 12/10/04 | 20,576 | $33.20 | $683,123.20 |
| | 12/13/04 | 16,700 | $33.50 | $559,466.70 |
| | 12/15/04 | 43,300 | $34.02 | $1,473,066.00 |
| | 03/28/06 | 30,000 | $35.27 | $1,058,100.00 |
| | 06/23/06 | 40,000 | $34.91 | $1,396,404.00 |
| | **Total Shares Sold =** | **968,576** | **Total Proceeds =** | **$22,533,899.90** |
| Warmenhoven | 08/22/03 | 50,000 | $22.18 | $1,109,000.00 |
| | 09/08/03 | 200,000 | $23.58 | $4,716,000.00 |
| | 12/19/03 | 125,000 | $19.75 | $2,468,750.00 |
| | 03/15/04 | 1,500 | $19.99 | $29,985.00 |
| | 03/23/04 | 85,000 | $20.17 | $1,714,101.50 |
| | 06/23/04 | 90,000 | $20.03 | $1,802,799.00 |
| | 06/25/04 | 10,000 | $20.95 | $209,500.00 |
| | 06/25/04 | 3,000 | $21.02 | $63,060.00 |
| | 07/01/04 | 25,000 | $20.71 | $517,832.50 |
| | 09/08/04 | 25,000 | $21.06 | $526,525.00 |
| | 09/10/04 | 25,000 | $22.00 | $550,000.00 |
| | 09/23/04 | 50,000 | $23.00 | $1,150,000.00 |
| | 09/24/04 | 50,000 | $22.88 | $1,143,750.00 |
| | 10/01/04 | 25,000 | $23.41 | $585,300.00 |
| | 11/01/04 | 25,000 | $24.25 | $606,225.00 |
| | 12/01/04 | 25,000 | $30.43 | $760,675.00 |
| | 12/06/04 | 250,000 | $32.56 | $8,139,500.00 |
| | 01/03/05 | 25,000 | $33.25 | $831,250.00 |
| | 02/01/05 | 25,000 | $31.90 | $797,400.00 |
| | 03/01/05 | 25,000 | $29.79 | $744,850.00 |
| | 03/31/05 | 23,668 | $27.77 | $657,224.86 |
| | 03/31/05 | 120,000 | $27.40 | $3,287,496.00 |
| | 03/31/05 | 120,000 | $27.71 | $3,325,500.00 |
| | 03/31/05 | 93,608 | $27.77 | $2,599,353.75 |
| | 04/07/05 | 25,000 | $29.06 | $726,617.50 |
| | 05/20/05 | 25,000 | $30.00 | $750,000.00 |
| | 06/22/05 | 50,000 | $29.65 | $1,482,655.00 |
| | 06/23/05 | 50,000 | $30.00 | $1,500,000.00 |
| | 09/16/05 | 100,000 | $23.61 | $2,360,600.00 |
| | 11/23/05 | 59,785 | $29.61 | $1,770,120.26 |
| | 11/29/05 | 140,215 | $29.65 | $4,157,571.05 |
| | 01/11/06 | 50,000 | $30.20 | $1,510,000.00 |

| | | | | |
|---|---|---|---|---|
| | 01/12/06 | 400,000 | $32.47 | $12,986,400.00 |
| | 03/02/06 | 50,000 | $34.70 | $1,735,000.00 |
| | 03/17/06 | 50,000 | $35.20 | $1,760,000.00 |
| | 03/29/06 | 50,000 | $35.70 | $1,785,040.00 |
| | 03/31/06 | 2,300 | $36.37 | $83,641.80 |
| | 03/31/06 | 725 | $36.35 | $26,353.75 |
| | 09/18/06 | 38,300 | $35.20 | $1,348,160.00 |
| | 09/18/06 | 11,600 | $35.21 | $408,436.00 |
| | 09/18/06 | 100 | $35.22 | $3,522.00 |
| | 09/19/06 | 100,000 | $35.99 | $3,598,520.00 |
| | 09/19/06 | 50,000 | $35.97 | $1,798,500.00 |
| | 09/20/06 | 25,000 | $36.70 | $917,500.00 |
| | 09/20/06 | 25,000 | $36.74 | $918,500.00 |
| | 09/27/06 | 50,000 | $37.20 | $1,860,145.00 |
| | **Total Shares Sold =** | **2,849,801** | **Total Proceeds =** | **$81,823,359.97** |
| | **GRAND TOTAL OF SHARES SOLD =** | **15,331,909** | **GRAND TOTAL PROCEEDS =** | **$427,497,986.98** |

**THE INDIVIDUAL DEFENDANTS' BREACHES OF FIDUCIARY DUTIES**

60. In a misguided effort to attract and retain employees in a competitive environment, the Individual Defendants exceeded the bounds of the law and legitimate business judgment by perpetrating their backdating scheme. The Individual Defendants' misconduct was unjustifiable and constituted a gross breach of their fiduciary duties by:

(a) colluding with each other to backdate stock option grants;

(b) colluding with each other to violate GAAP and Section 162(m);

(c) colluding with each other to produce and disseminate to Network Appliance shareholders and the market false financial statements that improperly recorded and accounted for the backdated option grants and concealed the improper backdating of stock options; and

(d) colluding with each other to file false proxy statements, false financial statements, and false Form 4's in order to conceal the improper backdating of stock options.

61. The Individual Defendants' foregoing misconduct was not, and could not have been, an exercise of good faith business judgment. Rather, it was intended to, and did, unduly benefit the Option Recipient Defendants at the expense of the Company.

62. As a direct and proximate result of the Individual Defendants' foregoing breaches of fiduciary duties, the Company has sustained millions of dollars in damages, including but not limited to, the additional compensation expenses and tax liabilities the Company will be required to incur and loss of funds paid to the Company upon exercise of options.

63. As alleged herein, the Option Recipient Defendants have exercised hundreds of thousands of backdated options at improperly low prices and have then sold the shares for hundreds of millions in proceeds. Consequently, the Option Recipient Defendants have been unjustly enriched by garnering millions of dollars in illicit profits and depriving the Company of millions of dollars in payments that the Company should have received upon exercise of the options.

## DERIVATIVE AND DEMAND EXCUSED ALLEGATIONS

64. Plaintiff brings this action derivatively in the right and for the benefit of the Company to redress the Individual Defendants' breaches of fiduciary duties and unjust enrichment.

65. Plaintiff is an owner of Network Appliance common stock and was an owner of Network Appliance common stock at all times relevant hereto.

66. Plaintiff will adequately and fairly represent the interests of the Company and its shareholders in enforcing and prosecuting its rights.

67. As a result of the facts set forth herein, Plaintiff has not made any demand on the Network Appliance Board of Directors to institute this action against the Individual Defendants. Such demand would be a futile and useless act because the Board is incapable of making an independent and disinterested decision to institute and vigorously prosecute this action.

68. The Board currently consists of ten directors: defendants Allen, Bartz, Earhart, Leslie, Moore, Shaheen, Valentine, Wall, and Warmenhoven, and director Edward Kozel ("Kozel"). The following directors are incapable of independently and disinterestedly considering a demand to commence and vigorously prosecute this action:

(a) Warmenhoven, Allen, Bartz, and Valentine, because they are directly interested in the improperly backdated stock option grants complained of herein;

(b) Bartz and Wall, because as members of the Compensation Committee, they directly participated in and approved the improper backdating of stock options, as alleged herein, and therefore are substantially likely to be held liable for the misconduct complained of herein. Moreover, by colluding with the Option Recipient Defendants and others, as alleged herein, Bartz and Wall have demonstrated that they are unable or unwilling to act independently of the Option Recipient Defendants;

(c) Moore and Wall, because as members of the Audit Committee, they directly participated in and knowingly approved the filing of false financial statements and other false SEC filings as alleged herein and directly participated in and approved the Company's violations of GAAP and Section 162(m), as alleged herein, and therefore are substantially likely to be held liable for the misconduct complained of herein. Moreover, by colluding with the Option Recipient Defendants and others, as alleged herein, Wall and Moore have demonstrated that they are unable or unwilling to act independently of the Option Recipient Defendants;

(d) Allen, Bartz, Earhart, Leslie, Moore, Shaheen, Valentine, Wall, and Warmenhoven, because as directors of the Company they directly participated in and approved the Company's filing of and signed false financial statements and other false SEC filings, as alleged herein, and therefore are substantially likely to be held liable for the misconduct complained of herein. Moreover, by colluding with the Option Recipient Defendants and others, as alleged herein, Allen, Bartz, Earhart, Leslie, Moore, Shaheen, Valentine, Wall, and Warmenhoven have demonstrated that they are unable or unwilling to act independently of the Option Recipient Defendants;

(e) Warmenhoven, because his principal professional occupation is his position as Chief Executive Officer of the Company. In his position as Chief Executive Officer, Warmenhoven stands to earn hundreds of thousands of dollars in annual

salary, bonuses, and other compensation, all of which must be approved by Defendants Bartz, Leslie, and Wall, who are currently on the Compensation Committee. Accordingly, Warmenhoven is incapable of independently and disinterestedly considering a demand to commence and vigorously prosecute this action against the Individual Defendants; and

(f) Bartz, Earhart, Kozel, Valentine, and Wall, because they share a long-standing personal and professional relationship especially with regard to their work at Cisco Systems, Inc. ("Cisco"). In this respect, Bartz, Kozel, and Valentine served together on the Board of Directors of Cisco for many years. Moreover, Earhart, as the managing partner of PricewaterhouseCoopers' Silicon Valley offices, worked closely with Cisco. Wall was on the Board of Directors of Clarity Wireless, Inc. that was acquired by Cisco in November 1998 when Bartz, Kozel, and Valentine were on its Board. Accordingly, Bartz, Earhart, Kozel, Valentine, and Wall are incapable of independently and disinterestedly considering a demand to commence and vigorously prosecute this action against each other.

69. Furthermore, demand is excused because the misconduct complained of herein was not, and could not have been, an exercise of good faith business judgment. As represented in Network Appliance's proxy statements, the stated purpose of the Company's shareholder-approved stock option plans is to motivate employees by providing compensation that reflects the financial performance of the Company and "align[s] the interests of each executive officer with those of the shareholders." However, by granting options with backdated exercise prices, the Individual Defendants undermined the purpose of the Company's shareholder-approved stock option plans by awarding employees compensation that had intrinsic value regardless of Network Appliance's financial performance. In effect, this practice was nothing more than secret handouts to executives and employees at the expense of unsuspecting shareholders and the Company.

70. The Individual Defendants could have achieved the stated purpose of motivating employees by granting them additional options under their incentive plans, or by granting options at a price less than the fair market value on the date of the grant and simply disclosing and

expensing these grants. Instead, the Individual Defendants motivated Network Appliance's employees by backdating option grants in violation of the Company's shareholder-approved stock option plans and improperly reporting these grants in their financial disclosures to improve their bottom line.

**COUNT I**

**Against the Individual Defendants for**
**Violations of § 10(b) and Rule 10b-5 of the Securities Exchange Act**

71. Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

72. Throughout the relevant period, the Individual Defendants individually and in concert, directly and indirectly, by the use and means of instrumentalities of interstate commerce and/or of the mails, intentionally or recklessly employed devices, schemes, and artifices to defraud and engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the Company.

73. The Individual Defendants, as top executive officers and/or directors of the Company, are liable as direct participants in the wrongs complained of herein. Through their positions of control and authority as officers and/or directors of the Company, each of the Individual Defendants was able to and did control the conduct complained of herein.

74. The Individual Defendants acted with scienter in that they either had actual knowledge of the fraud set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose the true facts, even though such facts were available to them. The Individual Defendants were among the senior management and directors of the Company and were therefore directly responsible for the fraud alleged herein.

75. The Company relied upon the Individual Defendants' fraud in granting the Option Recipient Defendants' options to purchase shares of the Company's common stock, as alleged herein.

76. As a direct and proximate result of the Individual Defendants' fraud, the Company has sustained damages, including, but not limited to, the additional compensation expenses and tax

liabilities the Company will be required to incur and loss of funds paid to the Company upon exercise of options.

## COUNT II

### Against the Individual Defendants for
### Violations of §14(a) of the Securities Exchange Act

77. Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

78. Rule 14-A-9, promulgated pursuant to §14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. §240.14-A-9.

79. The proxy statements described herein violated §14(a) and Rule 14-A-9 because they omitted material facts, including the fact that the Individual Defendants were causing the Company to engage in an option backdating scheme, a fact which the Individual Defendants were aware of and participated in from at least 1996 to 2002.

80. In the exercise of reasonable care, the Individual Defendants should have known that the proxy statements were materially false and misleading.

81. The misrepresentation and omissions in the proxy statements were material. The proxy statements were an essential link in the accomplishment of the continuation of the Individual Defendants' unlawful stock option backdating scheme, as revelations of the truth would have immediately thwarted a continuation of shareholders' endorsement of the directors' positions, the executive officers' compensation, and the Company's compensation policies.

82. The Company was damaged as a result of the material misrepresentations and omissions in the proxy statements.

regarding the Company, including the information set forth herein regarding the true adverse facts of the Company's option backdating, improper accounting, and false financial statements.

105. At the time of such sales, that information was not generally available to the public or the securities markets. Had such information been generally available, it would have significantly reduced the market price of the Company's shares at that time.

106. The Insider Selling Defendants, and each of them, had actual knowledge of material, adverse non-public information regarding the Company, and thus sold their shares of the Company's common stock in California in violation of California Corporations Code § 25402.

107. Pursuant to California Corporations Code § 25502.5, the Insider Selling Defendants, and each of them, are liable to the Company for damages in an amount up to three times the difference between the price at which the stock was sold by these defendants, and each of them, and the market value which the stock would have had at the time of the sale if the information known to these defendants had been publicly disseminated prior to that time and a reasonable time had elapsed for the market to absorb the information.

WHEREFORE, Plaintiff demands judgment as follows:

A. Against all of the Individual Defendants and in favor of the Company for the amount of damages sustained by the Company as a result of the Individual Defendants' misconduct;

B. Ordering the Option Recipient Defendants to disgorge to the Company all of the backdated stock options they received, including the proceeds of any such options that have been exercised, sold, pledged, or otherwise monetized, and imposing a constructive trust thereover;

C. Awarding the Company treble damages against the Insider Selling Defendants as provided by California Corporations Code § 25502.05;

D. Granting appropriate equitable relief to remedy Individual Defendants' breaches of fiduciary duties;

E. Awarding to Plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

F. Granting such other and further relief as the Court deems just and proper.

## JURY TRIAL DEMANDED

Plaintiff demands a trial by jury.

## CERTIFICATION OF INTERESTED ENTITIES OR PERSONS

Pursuant to Civil Local Rule 3-16, the undersigned certifies that as of this date, other than the named parties there is no such interest to report.

Dated: October 17, 2006

BRAMSON, PLUTZIK, MAHLER & BIRKHAEUSER, LLP

[signature]
Alan R. Plutzik

Alan R. Plutzik
L. Timothy Fisher
Kathryn A. Schofield
2125 Oak Grove Road, Suite 120
Walnut Creek, California 94598
Telephone: (925) 945-0200
Facsimile: (925) 945-8792

SCHIFFRIN & BARROWAY LLP
Eric L. Zagar
Trevan Borum
Tara P. Kao
280 King of Prussia Road
Radnor, PA 19087
Telephone: (610) 667-7706
Facsimile: (610) 667-7056

Attorneys for Plaintiff

## VERIFICATION

I, Nicholas J. Staffieri, General Counsel of the Southeastern Pennsylvania Transportation Authority, hereby verify that I have reviewed the Complaint and authorized its filing and that the facts therein are true and correct to the best of my knowledge, information, and belief. I declare under penalty of perjury that the foregoing is true and correct.

Dated: October 16, 2006

Nicholas J. Staffieri, *General Counsel*
Southeastern Pennsylvania Transportation Authority